UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DOUGLAS GILSTRAP and MYRON
TATARYN, each on behalf of himself and all
others similarly situated,

                       Plaintiffs,                  05 Civ. 7947 (PKC)

        -against-                  MEMORANDUM
                                      AND
RADIANZ LTD., RADIANZ AMERICAS, INC.,    <u>ORDER</u>
REUTERS LIMITED, BLAXMILL (SIX) LIMITED,
REUTERS C LLC, REUTERS AMERICA LLC, and
BRITISH TELECOMMUNICATIONS plc,

                       Defendants.
-------------------------------------------------------------x


P. KEVIN CASTEL, U.S.D.J.

          Plaintiffs bring this action on their own behalf and on behalf of current or for-

mer employees of defendants Radianz Ltd. ("Radianz") and/or Radianz Americas, Inc. (col-

lectively, the "Radianz Cos."), asserting claims relating to a stock option plan which governed

the plaintiffs' rights to acquire shares in Radianz (the "Plan").  Plaintiffs contend, among

other things, that the Radianz Cos. breached their obligations under the Plan, and that, in con-

nection with a sale of the Radianz Cos. by defendants Reuters Limited, Blaxmill (Six) Lim-

ited, Reuters C LLC, and Reuters America LLC (collectively, "Reuters") to defendant British

Telecommunications ("BT"), Reuters and BT manipulated the purchase price of the Radianz

Cos. so as to make worthless options that had been awarded to plaintiffs under the Plan.  The

plaintiffs assert claims for breach of contract, breach of the duty of good faith and fair deal-

ing, tortious interference with contractual relations, unjust enrichment and breach of fiduciary

duty.

Defendants have moved to dismiss this action on the ground of <u>forum</u> <u>non</u> <u>conveniens</u>.  They contend that virtually all of the parties, witnesses and relevant evidence are located in England.  They contend that all of the events at issue in the action occurred in England, including the adoption and amendment of the Plan, and the negotiation and documentation of the sale of the Radianz Cos. by Reuters to BT.  They also note that the Plan governed options to acquire shares in an English company (Radianz), and that all option holders located in the U.S. (a group that makes up only 40 percent of the putative class) were explicitly informed that the shares were not registered on any U.S. exchange.  Defendants argue that, at bottom, this action relates entirely to the internal corporate governance of, and transactions between, English companies.  As such, they contend that England provides an adequate, and more appropriate, forum for litigation of plaintiffs' claims.

As discussed herein, I conclude that the courts of England represent an adequate alternative forum for the resolution of this dispute and the relevant private and public interest factors weigh heavily in favor of dismissal and, accordingly, the motion is conditionally granted.  Central to this lawsuit is the claim that defendants breached a stock option plan which was adopted and subsequently amended in England, and governed the rights of employees to purchase English securities.  The events giving rise to the claim that the stock option plan was breached arise out of the sale of Radianz from one English company to another, which transaction was negotiated and documented in England.  Approximately 40 percent of the putative class members reside in England.  While another approximately 40 percent of the putative class members reside in the U.S., only 16 percent of those are residents of the state of New York.  Significantly, though Radianz apparently maintained its operational headquarters in New York, the events at issue in this action have little, if any, connection to the District.

The vast majority of the key witnesses and documents are located in England.  Assessment of the credibility of witnesses will be important in this case and can be best accomplished in England, where the witnesses – particularly non-party witnesses – will be able to testify in the presence of the fact-finder.  Furthermore, English law is likely to apply to the claims in this action and no federal statutory claims are asserted.

Background

Plaintiff Gilstrap is "a principal founder, and the former President and CEO, of Radianz," who, during his tenure as a Radianz employee, worked out of the company's "global headquarters in New York."  (Cmplt. ¶ 30)[1]  Gilstrap is currently a resident of Houston, Texas.  (Cmplt. ¶ 12)  Plaintiff Tataryn was employed by Radianz in London for approximately four years, and is currently a resident of Suffolk, England.  (Cmplt. ¶¶ 31, 12)  Both plaintiffs were participants in the Plan and allege that they continue to hold Radianz stock options.  (Cmplt. ¶ 12)

Radianz, a telecommunications company which provides "extranet" services (private internet protocol services) to the financial community, was formed in May 2000 as a joint venture between Reuters and a telecommunications company called Equant, which is not a party to this case.  (Cmplt. ¶ 32)  Fifteen percent of the company's stock was set aside to be distributed to Radianz employees through the Plan.  (Cmplt. ¶ 33)  While plaintiffs allege that approximately 70 percent of the outstanding options were issued to employees who worked for Radianz in the United States (Cmplt. ¶ 34), they do not contest defendants' assertion that

---

[1]    Citations to "Cmplt." refer to the First Amended Class Action Complaint, dated December 15, 2005.

approximately 60 percent of the individuals who participated in the Plan are located outside the United States, with 40 percent in England.

In the spring of 2004, Reuters and Equant decided to sell their interests in Radianz and, in September 2004, accepted a bid from BT, an English company. (Cmplt. ¶¶ 39, 41) Plaintiffs contend that while the purchase price of Radianz was announced as $175 million, that figure "did not represent the true value Reuters received from the sale of Radianz," and that the "true purchase price was at least $580 million and possibly higher than $800 million." (Cmplt. ¶ 41) Prior to the consummation of the sale to BT, Reuters bought out Equant's interest in Radianz in November 2004 for approximately $150 million. (Cmplt. ¶ 50)

The Plan contained provisions whereby option holders, upon being notified of a proposed sale of the entire interest in Radianz to an entity unrelated to Reuters or Equant, could exercise their options to acquire shares in anticipation of selling those shares to the proposed buyer. The Plan also contained a provision authorizing the Radianz Board to replace Radianz options with options to purchase stock in the acquiring company. (Cmplt. ¶ 53) While the Radianz Board was vested with the power to amend the Plan, the Plan contained a provision stating that "no amendment shall be effective which would materially prejudice the interests of Option Holders in relation to Options already granted to them" unless such holders consented. (Cmplt. ¶ 52, Ex. A § 8.3.1)

In March 2005, the Radianz Board voted to amend the Plan. The Amended Plan added a "cash cancellation" provision, which enabled the Radianz Board, in the event of a proposed sale of the company, and "in its absolute discretion," to cancel all options in exchange for a cash payment to the option holders. The amount of the payment was to be de-

termined by a formula set forth in the Amended Plan, and was based on the difference between the purchase price per share to be paid by the acquiring entity and the exercise price of the option to be canceled. If the exercise price exceeded the per share price to be paid, the Amended Plan provided that a "nominal amount" would be paid for each canceled option. (Cmplt. 54)

Based upon the stated purchase price of $175 million, the Radianz Board determined that the per share price to be paid by BT was lower than the exercise price on all existing options. Pursuant to the cash cancellation provision, Radianz canceled all options and, in April 2005, paid all option holders ten cents per share. (Cmplt. ¶ 56)

Plaintiffs filed the initial complaint in this action on September 12, 2005.

Forum Non Conveniens

The doctrine of forum non conveniens allows a district court to "'resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute.'" Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947)), cert. denied, 126 S. Ct. 2320 (May 30, 2006). District courts have broad discretion in deciding whether to dismiss an action on the ground of forum non conveniens, but should be guided by the "central notions of … the convenience of the parties and their witnesses and that justice be served." Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1227 (2d Cir. 1996).

In the Second Circuit, district courts are instructed to assess forum non conveniens motions under a three-step process. First, the court must determine the degree of deference that is properly afforded the plaintiff's choice of forum. Then, it must determine whether the alternative forum proposed by the moving party constitutes an adequate forum for

the resolution of plaintiff's claims. Finally, assuming the alternative forum is found to be adequate, the court must weigh the relevant private and public interest factors and determine whether the plaintiff's chosen forum or the proposed alternative is, in fact, more convenient and appropriate. See Norex, 416 F.3d at 153 (citing Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc)). "[T]here is no algorithm that assigns precise weights to the factors that inform forum non conveniens determinations. The doctrine instead is intensely practical and fact-bound. The most that may be said is that courts reach informed judgments after considering all of the pertinent circumstances." First Union Nat'l Bank v. Paribas, 135 F. Supp. 2d 443, 448 (S.D.N.Y. 2001), aff'd, 48 Fed. Appx. 801 (2d Cir. 2002).

Deference to Plaintiff's Choice of Forum

Generally, a plaintiff's choice of the forum in which to bring suit is entitled to substantial deference. The Supreme Court has instructed that, on forum non conveniens motions, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Gulf Oil, 330 U.S. at 508. The Second Circuit has interpreted this language as equivalent to an "assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating" that its proposed alternative is more appropriate. Iragorri, 274 F.3d at 71; see also Aguinda v. Texaco, Inc., 303 F.3d 470, 476 (2d Cir. 2002) (defendant bears the burden on forum non motion).

The Iragorri court recognized that prior Supreme Court jurisprudence had established that a plaintiff's choice of forum is entitled to "great deference" when the plaintiff sues in his home forum, but that when a foreign plaintiff sues in a U.S. forum, his choice is entitled to less deference. Iragorri, 274 F.3d at 71 (citing Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947) and Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56

(1981)).  However, the <u>Iragorri</u> court undertook to examine a situation with which the Su-
preme Court had not yet dealt, "a United States resident plaintiff's suit in a U.S. district other
than that in which the plaintiff resides."  <u>Iragorri</u>, 274 F.3d at 71.  As to plaintiff Gilstrap, who
resides in Texas, that is the situation presented here.  Even prior to <u>Iragorri</u>, the Second Cir-
cuit recognized that the mere fact that a plaintiff is a United States citizen did not preclude
dismissal on <u>forum</u> <u>non</u> <u>conveniens</u> grounds.  <u>See</u>, <u>e.g.</u>, <u>Scottish Air</u>, 81 F.3d at 1232 ("al-
though a citizen plaintiff's choice of forum deserves considerable deference, it is not auto-
matically dispositive in determining a <u>forum</u> <u>non</u> <u>conveniens</u> motion") (citation omitted); <u>First</u>
<u>Union</u>, 135 F. Supp. 2d at 448 (plaintiff's citizenship "ultimately may be outweighed by a suf-
ficiently robust showing in favor of an alternative forum").

 In <u>Iragorri</u>, the Second Circuit described a "sliding scale" approach to defer-
ence, whereby "the greater the plaintiff's or the lawsuit's bona fide connection to the United
States and to the forum of choice and the more it appears that considerations of convenience
favor the conduct of the lawsuit in the United States, the more difficult it will be for the de-
fendant to gain dismissal for <u>forum</u> <u>non</u> <u>conveniens</u>."  <u>Iragorri</u>, 274 F.3d at 72 (footnotes
omitted); <u>see also</u> <u>Cromer Fin. Ltd. v. Berger</u>, 158 F. Supp. 2d 347, 353 (S.D.N.Y. 2001) ("It
is well settled that every plaintiff's selection of forum receives deference, although the degree
of deference increases as the plaintiff's ties to the forum increase.") (internal quotation marks
and citation omitted).

 The <u>Iragorri</u> court identified certain factors that support denial of a <u>forum</u> <u>non</u>
<u>conveniens</u> motion, including the convenience of the forum as related to plaintiff's residence,
availability of witnesses and evidence, whether defendants are amenable to suit in the chosen
forum, the availability of legal assistance, and "other reasons relating to convenience or ex-

pense." Iragorri, 274 F.3d at 72. On the other hand, the court held that a plaintiff's choice of forum should be afforded less deference the more it appears as though the choice was motivated by forum-shopping, for example, to take advantage of more favorable laws and/or a jury pool renowned for returning verdicts favorable to plaintiffs, or to inconvenience the defendant. Id. Courts are instructed to "consider a plaintiff's likely motivations in light of all the relevant indications." Id. at 73.

Here, the courthouse in the Southern District of New York is likely more convenient to plaintiff Gilstrap, a resident of Houston, than would be a Court located somewhere in England. Nonstop flights between Houston and New York are frequent and of relatively short duration, whereas there appear to be at most four daily nonstop flights in each direction between Houston and London, with most other flights connecting through an East Coast city. Litigation in New York would also likely prove less expensive for Gilstrap than litigation in England. The only other named plaintiff in this action, Tataryn, resides in Suffolk, England. No credible claim can be made on his behalf that litigation in an English court would be less convenient.

Plaintiffs' choice of forum is also entitled to less deference where, as here, they are suing in a representative capacity. See DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 28 (2d Cir.), cert. denied, 537 U.S. 1028 (2002); In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 230 F. Supp. 2d 376, 388 (S.D.N.Y. 2002); Koster, 330 U.S. at 523-24. Though the fact that a plaintiff sues as a representative of a putative class does not mean that his choice of forum is deprived of all deference, plaintiffs in such cases generally "have only a small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions." DeYoung v. Beddome, 707 F. Supp. 132, 138 (S.D.N.Y. 1989). Ap-

proximately sixty percent of the putative class members reside outside the U.S., with a majority of those residing in England, the proposed alternative forum. It is worth noting, however, that according to counsel's representations at oral argument, plaintiff Gilstrap himself is the holder of approximately 20 percent of all outstanding options. Thus, he has more than a "small direct interest" in the outcome of the litigation.

The choice of a U.S. forum by plaintiff Tataryn, a resident of England who purports to represent a subclass of non-residents, is presumptively entitled to "considerably less" deference. Cromer Fin. Ltd. v. Berger, 158 F. Supp. 2d 347, 355, (S.D.N.Y. 2001); see also Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs. Corp., 421 F. Supp. 2d 741, 754 (S.D.N.Y. 2006). However, as with resident plaintiffs, the more "legitimate reasons" a foreign plaintiff has for bringing suit in a U.S. court, the more deference his choice is due. See Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006). Beyond the availability of contingent fees and class actions, and a desire to join with Gilstrap, little or nothing is provided as to Tataryn's reasons for suing in New York rather than in his home forum, England. His choice is entitled to some, but slight, deference.

Thus, "[t]he named plaintiffs' lack of bona fide connections to this District indicates that their choice of forum should be accorded less deference than that due a resident plaintiff seeking redress." In re Royal Group Techs. Sec. Litig., 2005 WL 3105341 at *2 (S.D.N.Y. Nov. 21, 2005) (citation omitted); see also Saab v. Citibank, N.A., 2001 WL 1382577 at * 3 (S.D.N.Y. Nov. 7, 2001) ("The general rule is that deference increases as the plaintiff's ties to the forum increase.") (internal quotation marks and citation omitted), aff'd, 50 Fed. Appx. 467 (2d Cir. 2002).

Moreover, unlike plaintiffs in <u>DiRienzo</u>, plaintiffs here are not seeking to enforce the U.S. securities laws. <u>See</u> <u>DiRienzo</u>, 294 F.3d at 28; <u>Cromer Fin.</u>, 158 F. Supp. 2d at 356 (denying <u>forum</u> <u>non</u> motion in part because "United States courts have an interest in enforcing United States securities laws") (citation omitted). The options distributed under the Plan granted holders the right to purchase shares of an English company, and were not traded on any U.S. exchange. Though plaintiffs claim that Radianz "sought out" U.S. citizens for employment and enticed them to work for the company by offering participation in the Plan, such allegations do not entitle plaintiffs' choice of this forum to the same degree of deference afforded in <u>DiRienzo</u>, where the court found that defendants had "sought out business opportunities in this country by registering stock on American exchanges, filing statements with the SEC and conducting the bulk of its [sic] business in the United States." <u>DiRienzo</u>, 294 F.3d at 28. The court in <u>DiRienzo</u> was also properly skeptical of defendants' contention that the Southern District of New York was an inconvenient forum in that case because defendants had moved to consolidate all related cases as a Multidistrict litigation in this very District and, in granting that motion, the Judicial Panel on Multidistrict Litigation had found that such consolidation would be conducive to the convenience of parties and witnesses. <u>Id</u>. at 28-29; <u>see also</u> <u>In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.</u>, 228 F. Supp. 2d 348, 352 (S.D.N.Y. 2002) (plaintiffs' choice entitled to great deference where defendant conceded convenience of forum by moving for MDL consolidation); <u>In re Cinar Corp. Sec. Litig.</u>, 186 F. Supp. 2d 279, 296 (E.D.N.Y. 2002) (same).

Plaintiffs claim that their choice of forum should be entitled to greater deference because Radianz maintained its headquarters here in New York and because Reuters and BT maintain offices and do business here as well. However, even if New York were consid-

ered the "home forum" of some of the defendants, "a plaintiff's choice to initiate suit in the defendant's home forum . . . only merits heightened deference to the extent that the plaintiff and the case possess *bona fide* connections to, and convenience factors favor, that forum." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 74 (2d Cir. 2003), cert. denied, 540 U.S. 1149 (2004). "[W]here the circumstances indicate that the parties and events bear no bona fide connection to the United States, or that in relation to the core operative facts in dispute they at best may have only marginal links to the plaintiff's selected forum, that choice of venue is not entitled to special deference . . . ." Corporacion Tim, S.A. v. Schumacher, 418 F. Supp. 2d 529, 534 (S.D.N.Y. 2006) (citations omitted), appeal docketed, No. 06-1485 (2d Cir. Apr. 7, 2006).

        The proposed class framed in the complaint is a worldwide class. I recognize that plaintiffs' choice of forum is entitled to some deference because plaintiff Gilstrap, a U.S. resident, seeks to represent a subclass of the overall class, consisting of only U.S. residents. But citizenship and/or residence of plaintiffs cannot be dispositive of the inquiry on a forum non conveniens motion. See Iragorri, 274 F.3d at 74 ("neither the plaintiff's citizenship nor residence, nor the degree of deference given to her choice of forum, necessarily controls the outcome") (citation omitted). This is, at least in part, because "there is little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner." First Union, 135 F. Supp. 2d at 448.

        As regards the availability of witnesses and evidence, plaintiffs claim that a New York forum is appropriate since Radianz maintains its headquarters in New York, since

there are approximately 400 United States citizens who are members of the putative class, and since "the witnesses most knowledgeable about the value of Radianz, and thus liability and damages," are located within this District. (Pl. Br. at 13-14) Defendants, on the other hand, contend that the majority of relevant witnesses and documentary evidence are located in England. The parties have identified those individuals they believe – at this early juncture – will be the primary witnesses, and this factor is discussed in greater detail below.

As also discussed in greater detail below, there are some indicia of forum-shopping present in plaintiffs' selection of this District in which to bring their claims as well. Plaintiffs admit that their decision to sue here rather than in England was, at least in part, motivated by the availability of contingent fees and class actions, procedural devices not available in England.

Thus, I go on to consider the adequacy of the proposed alternative forum, keeping in mind the point on the Second Circuit's "sliding scale" where the circumstances of this action properly place it.

Existence of an Adequate Alternative Forum

For a foreign forum to be considered adequate, generally all that is required is that the defendants are amenable to suit in that forum, and that the forum permits suits involving the subject matter of the dispute. See Norex, 416 F.3d at 157. It is only in "rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory" that such a forum may not be considered adequate. Piper Aircraft, 454 U.S. at 255 n. 22. "That the law of the foreign forum differs from American law 'should ordinarily not be given conclusive or even substantial weight' in assessing the adequacy of the forum." Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998) (quoting Piper Aircraft, 454 U.S. at 247). The courts of England have

often been found to constitute an adequate forum for resolution of business disputes such as that involved in this action. See, e.g., Pollux Holding, 329 F.3d at 75; see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 101 (2d Cir. 2000) ("We regard the British courts as exemplary in their fairness and commitment to the rule of law."), cert. denied, 532 U.S. 941 (2001).

Here, plaintiffs contend that defendants Reuters C LLC and Reuters America LLC, as Delaware LLCs with headquarters in New York, would not be amenable to suit in an English court. (Pl. Br. at 13) While defendants assert that these two entities had no involvement at all in the events relevant to this action, they state unequivocally that all defendants submit to the jurisdiction of an English court. Such a representation is sufficient to satisfy the first prong of the inquiry into the adequacy of the alternative forum. Norex, 416 F.3d at 157; PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74-75 (2d Cir. 1998).

As regards the second prong, plaintiffs do not seem to take issue with the notion that the courts of England would permit litigation of the dispute at issue here. Plaintiffs assert claims based in common law concepts which should be familiar to English courts, and the competence of the judges of that forum to adjudicate this dispute is beyond serious challenge. See, e.g., Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 610-11 (2d Cir. 1998) (English courts could adequately address claims of breach of contract, tortious interference and breach of fiduciary duty), cert. denied, 526 U.S. 1067 (1999).

Plaintiffs do assert that this Court should retain jurisdiction because English courts do not permit class actions or contingent fees. (Pl. Br. at 21) It is well-established, and plaintiffs acknowledge, however, that the unavailability of such procedural mechanisms as class actions and contingent fees, while it may be relevant to the balancing of the public and

private interest factors addressed below, does not render a foreign forum inadequate as a matter of law.  See, e.g., Aguinda, 303 F.3d at 478 (lack of class action mechanism in Ecuador "not so burdensome as to deprive the plaintiffs of an effective alternative forum") (citation omitted); In re Lloyd's Am. Trust Fund Litig., 954 F. Supp. 656, 673 (S.D.N.Y. 1997) (finding English courts to provide adequate alternative forum for a class action suit; "The absence of a rule providing for class actions in the alternative forum does not render the forum inadequate.") (citation omitted); Van der Velde v. Philip Morris Inc., 2004 WL 48891 at *3 (S.D.N.Y. Jan. 9, 2004) ("Plaintiff's complaints regarding contingency fees and the requirement that a losing party pay her opponent's fees do not concern the adequacy of available remedies.").

Thus, the Court concludes that England constitutes an adequate alternative forum for plaintiffs' claims.  As such, I go on to consider the relevant public and private interest factors identified by the Supreme Court and the Second Circuit.

Balancing of Public and Private Interest Factors

Almost sixty years after the Supreme Court's Gulf Oil decision, courts considering motions to dismiss on forum non conveniens grounds still assess the relevant public and private interest factors laid out by that Court.  The private interest factors identified by the Court, to the extent relevant here, are: 1) the relative ease of access to sources of proof; 2) availability of compulsory process to compel unwilling witnesses to appear; 3) the cost of procuring the attendance of witnesses willing to appear; and 4) "all other practical problems that make trial of a case easy, expeditious and inexpensive."  Gulf Oil, 330 U.S. at 508; Pollux Holding, 329 F.3d at 75.

The relevant public interest factors identified by the Supreme Court include: 1) court congestion; 2) the relation of the litigation to the chosen forum as opposed to its relation to the proposed alternative forum, i.e., the "local interest in having localized controversies de-cided at home," including a reluctance to impose jury duty on residents of a forum with little or no connection to the dispute; and 3) the interest in having the dispute adjudicated in a fo-rum that is "at home with the . . . law that must govern the case . . . ." Gulf Oil, 330 U.S. at 508-09; Pollux Holding, 329 F.3d at 76.

The balance of these factors must be "strongly in favor of the defendant" in or-der for dismissal to be appropriate. Norex, 416 F.3d at 154.

Here, the private interest factors weigh strongly in favor of dismissal. The par-ties disagree as to where the majority of the relevant witnesses are located. While defendants contend that "[v]irtually all of the relevant party and non-party witnesses" reside in England or other foreign lands, plaintiffs counter that most of the witnesses they need to prove their claims are located in the U.S., and the necessary English witnesses are likely to appear volun-tarily, as they are employees of defendants and regularly travel to the U.S.

At this preliminary stage of the litigation, prior to the completion of discovery, plaintiffs have identified their likely trial witnesses, the residences of those witnesses and the subjects of their proposed testimony, as follows:

> 1) Douglas Gilstrap; Houston, TX. As discussed above, Gilstrap is a named plaintiff and former president and CEO of Radianz. He is likely to testify about, inter alia, the creation of Radianz, the adoption of the Plan and the promise of options to lure employees to Radianz, discussions with BT about the purchase of Radianz, and Gilstrap's dealings with Reuters and Equant leading up to his departure from Ra-dianz.

2) Howard Edelstein; Boston, MA. Edelstein is former president and CEO of Radianz, apparently serving in that capacity both prior to and subsequent to the sale to BT. He is likely to testify about, _inter alia_, conversations with BT about the purchase of Radianz, the market value of Radianz and the purported amount of consideration actually received in the sale to BT, the role played by options in his compensation, the amendment of the Plan, and attempts by other putative purchasers to enter the bidding for Radianz.

3) Brennan Carley; Bronxville, NY. Carley is former Chief Technology Officer of Radianz. He is likely to testify about, _inter alia_, the role played by options in his compensation, discussions at Radianz board meetings about the sale to BT, and the purported amount of consideration actually received in the sale to BT.

4) Edward J. Banks; Darien, CT. Banks is former Head of Commercial Finance and Planning for Radianz. He is likely to testify about, _inter alia_, the number of option holders at the time of the sale of Radianz to BT, discussions regarding the conduct of independent valuations of Radianz preceding the sale, the amendment of the Plan, financial projections regarding Radianz's business, and purported discounts given to Reuters by Radianz after the sale to BT.

5) Phillip Emery; London, England.[2] Emery is the former CFO of Radianz, and is likely to testify about, _inter alia_, the market value of Radianz, discussions with Reuters and Equant about the bidding process, discussions with BT about the terms of the sale of Radianz and the purported amount of consideration actually received, and the valuation of Radianz options.

6) Paul Mallarkey; Virginia. Mallarkey is a partner with Houlihan, Lokey, Howard & Zukin ("Houlihan"), a firm that Radianz employed to perform valuations of the company over a period of years preceding the sale to BT. Mallarkey is likely to testify about, _inter alia_, the valuations performed by Houlihan and the assumptions and methodology underlying the valuations, and Houlihan's opinions about the value of Radianz at the time of the sale to BT.

7) Jeremy Krasner; Virginia. Krasner is a Houlihan executive. He is likely to testify about, _inter alia_, the valuation performed by Houlihan preceding the sale of Radianz to BT.

8) Brian Dillon; North Carolina. Dillon is the former head of Human Resources for Radianz. He is likely to testify about, _inter alia_, the "repricing" of Radianz options.

---

[2] Plaintiffs contend that, though Emery is employed in London, he frequently travels to New York and has expressed a willingness to testify in the United States.

9) Lance Boxer; New Jersey. Boxer is CEO of a company identified only as "IPC." He is likely to testify about, inter alia, Goldman Sachs's interest in purchasing Radianz.

10) Richard Poccia; New York. Poccia was the "lead accountant" at Price Waterhouse for Radianz matters. He is likely to testify about, inter alia, Radianz's financial condition and the "write down" of the Radianz options.

Plaintiffs have indicated that they do not control any of the individuals identified above with the exception of Gilstrap and plaintiff Tataryn, a resident of England, who the Court assumes was inadvertently omitted from plaintiffs' list of likely trial witnesses. Plaintiffs have indicated that they also intend to retain expert witnesses. Plaintiffs contend that Radianz maintains relevant documents "at locations in the United States." (Gilstrap Decl. ¶ 20)

Defendants contend that plaintiffs' assertion that U.S. witnesses and documents will take center stage at the trial of this action is simply inconsistent with the allegations of the complaint, which are focused on activities that occurred in England. For their part, defendants have identified as likely trial witnesses 21 individuals, eleven of whom are officers, directors, or employees of the defendants. The eleven party-affiliated witnesses are as follows:

1) Tim Collier; Orpington, England. Collier is a Reuters employee who was involved in the evaluation of bids for Radianz and the negotiation of the documents attendant to the sale to BT. He is likely to testify about, inter alia, the bidding process for the sale of Radianz, the valuation of Radianz, the negotiation of the sale documents, and the alleged interference by BT and Reuters with the contract between Radianz and the putative class (i.e., the Plan).

2) Peter Cross; London, England. Cross is CFO for a division of BT, and was the director of Corporate Finance for BT during the time period of the relevant events. He is likely to testify about, inter alia, the auction and bidding process for the sale of Radianz, the negotiation of

the sale documents, and the alleged interference by BT with the Plan and attendant diversion of compensation due to option holders.

3) Matthew Foss; London, England. Foss is in-house counsel for Reuters, and was involved in the negotiation and documentation of the sale of Radianz, and the amendment of the Plan. He is likely to testify about, inter alia, the auction and bidding process, the negotiation of the sale documents, the alleged interference by BT with the Plan and attendant diversion of compensation due to option holders, and the alleged breach of the Plan and breach of fiduciary duty.

4) David Grigson; London, England. Grigson is the CFO of Reuters Group PLC and a director of defendant Reuters Limited, and also served on the board of Radianz from June 2003 to March 2005. He is likely to testify about, inter alia, the relationship between Reuters and Radianz, the decision to sell Radianz, the auction and bidding process, and the negotiation and documentation of the sale, the valuations of Radianz, Equant's sale of its share of Radianz to Reuters, the amendment of the Plan and alleged breaches of the Plan and of fiduciary duty, and the alleged interference by BT and Reuters with the plan and attendant diversion of compensation due to option holders.

5) Bryan Martin; Sevenoaks, England. Martin is a Reuters employee who was involved in the evaluation of bids for Radianz and the negotiation of the service contract between Reuters and BT. He is likely to testify about, inter alia, the evaluation of bids for the sale of Radianz and associated valuations of Radianz, the negotiation and documentation of the service contract with BT, and the alleged interference by BT and Reuters with the plan and attendant diversion of compensation due to option holders.

6) Jim McInally; Glasgow, Scotland. McInally was the Global Head of Performance & Reward at Reuters, and is currently HR Director, Reward & Employee Relations at BT. He was a member of the Committee charged with determining compensation for Radianz employees, and was involved in the amendment of the Plan. He is likely to testify about, inter alia, the creation of the Plan, the evaluation of bids for the sale of Radianz and associated valuations of Radianz, and the amendment of the Plan and alleged breaches of the Plan and of fiduciary duty.

7) Jared Millar; Wheathamstead, England. Millar is an employee of Reuters in Business Development. He was involved in the auction and sale of Radianz, and the amendment of the Plan. He is likely to testify about, inter alia, the decision to sell Radianz and the evaluation of bids and associated valuations of Radianz, the negotiation and documentation of the sale, the amendment of the Plan, and the alleged interference by BT and Reuters with the plan and attendant diversion of compensation due to option holders.

8) Tim Nottidge; Hertfordshire, England. Nottidge is General Manager of BT Global Solutions. He is likely to testify about, <u>inter alia</u>, the negotiation of the service contract with BT, and the alleged interference by BT with the Plan.

9) Edward Rash; London, England. Rash is in-house counsel for Reuters. He was involved in negotiating and documenting the service contract with BT. He is likely to testify about, <u>inter alia</u>, the decision to sell Radianz, the negotiation of the service contract with BT, and the alleged interference by BT and Reuters with the Plan.

10) Neil Rogers; Buckinghamshire, England. Rogers is President of BT Global Solutions, and was involved in the auction process, the decision to buy Radianz, and the negotiation of the service contract. He is likely to testify about, <u>inter alia</u>, the auction and bidding process and associated valuations of Radianz, the negotiation of the service contract with BT, and the alleged interference by BT with the Plan.

11) Neil Stephens; London, England. Stephens is a BT employee in Business Development. He was involved in the auction process and the valuation of Radianz. He is likely to testify about, <u>inter alia</u>, the auction and bidding process and associated valuations, the negotiation and documentation of the sale documents, and the alleged interference by BT with the Plan and attendant diversion of compensation due to option holders.


The ten non-party witnesses identified by defendants are:


1) Mary Carter; London, England. Carter is a "share schemes specialist" with KPMG. She was involved in the drafting of the Plan, and will likely testify about, <u>inter alia</u>, that topic, alleged breaches of the Plan, and the alleged diversion of consideration due option holders to Reuters.

2) Philip Emery; London, England.[3] As noted above, Emery is the former CFO of Radianz, and is likely to testify about, <u>inter alia</u>, the evaluation of bids for Radianz and associated valuations of the company, the amendment of the Plan, and alleged breaches thereof.

3) Julian Goodwin; London, England. Goodwin is an employee of ABN-AMRO, who was involved in the valuation and sale of Radianz. He is likely to testify about, <u>inter alia</u>, the bidding and auction process and associated valuations of the company, and alleged interference by

---

[3] The Court assumes that the "Philip Emery" identified by defendants is the same individual as the "Phillip Emery" identified by plaintiffs, as both are apparently residents of London and both served as CFO of Radianz.

Reuters with the Plan and attendant diversion of compensation due to option holders.

4) Jennifer Honeyman; London, England. Honeyman is a solicitor with the firm of Slaughter and May, which represented Reuters in the sale of Radianz to BT. She is likely to testify about, inter alia, the negotiation and documentation of the sale, the amendment of the Plan, alleged breaches thereof and alleged interference by BT and Reuters with the Plan.

5) Eric Lakin; Surrey, England. Lakin is former Corporate Finance Manager of BT, and was involved in the purchase of Radianz. He is likely to testify about, inter alia, the bidding and auction process and associated valuations of the company, the negotiation and documentation of the sale, and alleged interference by BT with the Plan and attendant diversion of compensation due to option holders.

6) Gareth Newton; Sydney, Australia. Newton is former Director of Business Development for Reuters. He was involved in the auction process and the amendment of the Plan. He is likely to testify about, inter alia, the decision to sell Radianz, the auction and bidding process and associated valuations of the company, the negotiation and documentation of the sale, the acquisition by Reuters of Equant's share of Radianz, the amendment of the Plan, alleged breaches thereof, and the alleged interference by BT and Reuters with the Plan and attendant diversion of compensation due option holders.

7) Michael Sayers; Woking, England. Sayers is former Global Head of Operations and Technology for Reuters, and was a member of the board of Radianz. He is likely to testify about, inter alia, the decision to sell Radianz, the auction and bidding process and associated valuations, the negotiation and documentation of the service contract between BT and Radianz, the amendment of the Plan, alleged breaches thereof, and the alleged interference by BT and Reuters with the plan and attendant diversion of compensation due option holders, and the alleged breach of fiduciary duty by Radianz.

8) Jeffrey Twentyman; London, England. Twentyman is a solicitor with Slaughter and May. He is likely to testify about, inter alia, the negotiation and documentation of the sale, the amendment of the Plan, alleged breaches thereof and alleged interference by BT and Reuters with the Plan.

9) Gerd Weissenboeck; London, England. Weissenboeck is an employee of ABN-AMRO, and was involved in the valuation and sale of Radianz. He is likely to testify about, inter alia, the bidding and auction process and associated valuations of Radianz, and alleged interference by Reuters with the Plan and attendant diversion of compensation due option holders.

> 10) Barry Woodward; Woking, England.  Woodward is former Head
> of Infrastructure Development and Networking for Reuters.  He is
> likely to testify about, <u>inter alia</u>, the decision to sell Radianz, the auc-
> tion and bidding process and associated valuations, the negotiation and
> documentation of the service contract between Radianz and BT, and
> alleged interference by BT and Reuters with the Plan.

While it is alleged that Gilstrap was employed by Radianz in New York, and
that New York served as Radianz's headquarters, the events that plaintiffs contend gave rise
to their alleged damages concern the adoption and amendment of the Plan, and the sale of Ra-
dianz to BT, all of which occurred in England.  Defendants do not dispute that they have done
business in the United States, and some of them have sued and/or been sued in U.S. courts
before.  However, <u>forum</u> <u>non</u> motions are by necessity fact-specific, and "the court should fo-
cus on the *precise issues that are likely to be actually tried*, taking into consideration the con-
venience of the parties and the availability of witnesses and the evidence needed for the trial
of *these issues*."  <u>Iragorri</u>, 274 F.3d at 74 (emphasis added).

A review of the allegations of the complaint lends credence to defendants' con-
tention that the litigation is centered on events that occurred in England.  As pled, plaintiffs'
action claims the Radianz defendants breached the Plan, which was adopted in England,
amended in England, and governed the rights of the putative class (sixty percent of which is
comprised of non-U.S. residents) to purchase shares in an English company.  At the time the
Plan was adopted, the Radianz Board of Directors, which sat in England, was composed of six
individuals, four residents of England, one Swiss resident, and plaintiff Gilstrap, a U.S. resi-
dent and non-voting member of the Board.  Plaintiffs challenge the amendment of the Plan
(which amendment was effected in England) in connection with the sale of Radianz from one

English company to another English company.[4]  That sale, plaintiffs do not dispute, took place in England, and English banks and attorneys were involved, as evidenced by defendants' list of likely witnesses.

Plaintiffs argue that, because their claims depend on the true value of Radianz at the time of the sale to BT, witnesses from the Houlihan firm, which had performed several valuations of the company in the years leading up to the sale, will be important witnesses, and that those individuals are located in the U.S.  They have identified only two such individuals – Mallarkey and Krasner.  It is undisputed, however, that the Houlihan firm was not involved in the valuation of Radianz for purposes of the auction and eventual sale to BT, which is, of course, the transaction that is at the heart of this case.  Houlihan did conduct valuations at other points in time, and their historical valuations may be proven in a variety of ways, including through the recipients of the valuations.  At oral argument, plaintiffs' counsel left open the possibility that they may seek opinion testimony from the Houlihan firm; of course, if and to the extent Houlihan personnel are hired as experts, their appearance in England may be obtained consensually.  While plaintiffs also identify certain former Radianz management personnel that reside in the U.S., as defendants point out, plaintiffs allege in their own pleading that Radianz management "was not involved in the auction process" that led to the sale of Radianz to BT.  (Cmplt. ¶ 39)  I recognize that some witnesses based in the U.S. may have relevant testimony to give at the trial of this action.  It appears likely, however, that the majority of party and non-party witnesses are based in England.  More important than numerical majority, the key witnesses who are likely to be central to a resolution of the issues raised in

---

[4]     Reuters C LLC and Reuters Americas LLC, LLCs formed pursuant to Delaware law, are named as parties to the agreement by which the sale of Radianz to BT was consummated.  (Grigson Decl. Ex. K)  The Court recognizes that personnel employed by these entities might conceivably be called as witnesses, though plaintiffs have not identified any such persons in their papers.

the complaint are mainly based in England – including those involved in the bidding and auction process, and the challenged amendment to the Plan.

Even as to the witnesses who are within defendants' control, and could likely be produced for trial in this District voluntarily, courts are nevertheless instructed to weigh the costs of producing those witnesses. <u>Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs. Corp.</u>, 421 F. Supp. 2d 741, 766 (S.D.N.Y. 2006) (citing <u>Gulf Oil</u>, 330 U.S. at 508 and <u>Iragorri</u>, 274 F.3d at 74). While deposition testimony from foreign witnesses could likely be obtained through the use of letters rogatory and thereafter presented at trial, such a process has been recognized as time-consuming, and there is, of course, a preference for live testimony. <u>DiRienzo</u>, 294 F.3d at 30.

As regards access to documentary evidence, the parties recognize that, in the era of electronic discovery, this factor carries less weight than in the days of <u>Gulf Oil</u>. <u>See</u>, <u>e.g.</u>, <u>DiRienzo</u>, 294 F.3d at 30 (citation omitted). However, it is apparent from a review of the complaint and from the submissions of the parties that the majority of relevant documentary evidence is located in England. "Where most of the witnesses and documentary evidence reside in a foreign country, conducting trial in the U.S. could impose such significant burdens on the parties that dismissal is favored." <u>Strategic Value</u>, 421 F. Supp. 2d at 766 (citations omitted).

Though the lack of contingent fees and class actions in English courts may be considered relevant in weighing the private interests at stake, here, where the other private and public interest factors overwhelmingly favor dismissal, and where the only named plaintiff who is a U.S. citizen is not of modest means, and has represented to the Court, through counsel, that he intends to pursue litigation against defendants in England should this action

be dismissed, such a factor carries little weight.  See Murray v. British Broad. Co., 81 F.3d 287, 294 (2d Cir. 1996); Carey v. Bayerische Hypo-Und Vereinsbank, 370 F.3d 234, 238 (2d Cir. 2004); Van der Velde, 2004 WL 48891 at *4-*5; Gomez v. Banco Bilbao Vizcaya, S.A., 1993 WL 204990 at *3 (S.D.N.Y. June 7, 1993) (lack of contingency fees significant only "to the extent that it erects a pecuniary barrier to the plaintiff's commencement of a lawsuit" in the alternative forum) (citations omitted), aff'd, 17 F.3d 390 (2d Cir. 1993); Howe v. Gold-corp Invs. Ltd., 946 F.2d 944, 952 (1st Cir. 1991) ("procedural differences (such as greater difficulty in meeting class action requirements or less generous rules for recovering attorney's fees) are beside the point") (citing Piper Aircraft, 454 U.S. at 254, 252 n. 18), cert. denied, 502 U.S. 1095 (1992).  Plaintiff Gilstrap holds approximately 20 percent of all outstanding options, and this circumstance gives him the incentive to bring suit on his own behalf in England.  Moreover, though English courts might not offer the precise class action mechanism familiar to U.S. litigants, it has long been acknowledged that the English system "provides other procedural mechanisms to handle cases involving multiple plaintiffs-including representative actions, 'test' cases, and the consolidation of multiple actions."  In re Lloyd's, 954 F. Supp. at 673.  The individual claim of Mr. Gilstrap would appear to be ideally suited to be a test or "bellwether" suit which could form the basis for subsequent settlements or the application of the forum's claim preclusion principles.

Conversely, the fact that defendants are not individuals, but corporations that presumably have the financial resources to pay the costs associated with trial in this District, does not mean that the Court should necessarily impose upon them the burden of litigating in an otherwise inconvenient forum. See Reers v. Deutsche Bahn AG, 320 F. Supp. 2d 140, 162 (S.D.N.Y. 2004) ("The fact that defendants are corporations does not automatically mean that

they should bear the significant costs of transporting every document, every piece of physical evidence . . . and every witness relevant to the factual issues in dispute in this case.") (citation omitted).  To the extent plaintiffs are concerned that, should this action be dismissed in favor of an English forum, they would be unable to obtain pretrial discovery of persons and documents located within the United States, they may, of course, request that this Court – and any other district court with jurisdiction over individuals they believe to have relevant testimony and/or documents – order such persons to provide such discovery in aid of a foreign proceeding.  See 28 U.S.C. § 1782.  That such information might not otherwise be discoverable in an English forum does not preclude a district court from ordering compliance.  Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 260-61 (2004).

Plaintiffs, citing Gross v. British Broad. Corp., 386 F.3d 224, 232 (2d Cir. 2004), assert that defendants cannot legitimately claim that the Southern District of New York is an inconvenient forum in which to litigate this case, because defendants Reuters Ltd. and BT have filed suit in this District in the past.  In Gross, however, the Second Circuit merely quoted the district court's observations about the moving defendant's prior litigation in the plaintiff's chosen forum in noting the district court's own conclusion that the relevant private interest factors were either neutral, or only slightly favored dismissal.  Id. at 232-33.  Prior litigation in this District should not carry much weight in the forum non conveniens analysis, as the inquiry is necessarily fact-specific.  See, e.g., DiRienzo, 294 F.3d at 29.

In sum, having considered the relevant private interest factors, I find that they weigh substantially in favor of dismissal.

The public interest factors in this case also weigh strongly in favor of dismissal.  I consider relative court congestion an entirely neutral factor, as I have not been pro-

vided with any information on the status of cases in the English courts. Court congestion is of "little or no present significance" in this District, which has a "full complement of judges." Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 146 n.5 (2d Cir. 2000).

As discussed above, although forty percent of the putative class consists of U.S. residents who were employed by Radianz in the U.S., the locus of the principal relevant events relating to the adoption and amendment of the Plan, and the sale of Radianz by Reuters to BT, is in England. The matters at issue here are, in large part, those of "internal corporate governance" of English companies, in which English courts would have a much greater local interest than the citizens of this District. Scottish Air, 81 F.3d at 1234. While some U.S. citizens accepted employment with, and options to acquire shares of, Radianz, they were aware that they were working for an English corporation, and were being compensated, in part, in options on shares of an English company. Other than the facts that some members of the putative plaintiff class are U.S. residents (though neither of the named plaintiffs resides in this District), and the fact that defendants do business here (with Radianz maintaining its headquarters here), plaintiffs have failed to point out any bona fide connection between this suit and their chosen forum. "When most of the events took place in a foreign forum or forums and involve mostly foreign parties, the United States and its citizens have less interest in the resolution of the action than the foreign forum." Saab, 2001 WL 1382577 at *5 (granting forum non dismissal despite location of defendant's headquarters in New York) (citations omitted); see also Gomez, 1993 WL 204990 at *6-*7 (local interest in resolving dispute minimal despite plaintiff's status as U.S. citizen where "[a]ll events giving rise to Plaintiff's cause of action occurred in Spain," and defendant was Spanish corporation with New York branch office); Diatronics v. Elbit Computers, Ltd., 649 F. Supp. 122, 129-30 (S.D.N.Y. 1986) (dis-

missing action in favor of Israeli forum where "the entire transaction took place in Israel, and the matter involves two Israeli companies"), aff'd, 812 F.2d 712 (2d Cir. 1987).

The "local interest" of the English courts in this matter far exceeds the interest of the citizens of this District. See, e.g., Reers, 320 F. Supp. 2d at 160 ("to ask residents of the Southern District of New York to hear what would clearly be a lengthy and complex trial, involving Connecticut residents harmed by activities that occurred entirely in Europe, would be a significant burden").

The interest in having a dispute decided in a forum "at home with the . . . law that must govern the case" is denominated one of the relevant public interest factors. Gulf Oil, 330 U.S. at 509. The parties disagree about what law should be applied to plaintiffs' claims. Taking the plaintiffs' fiduciary duty claim as an example, defendants contend that, while there are some differences between the laws of New York and England as regards breach of fiduciary duty, under neither law do directors owe such a duty to option holders, and, as such, plaintiffs cannot state a claim for breach of such a duty regardless of which law applies.[5] Plaintiffs, for their part, contend that the laws of New York and England with respect to fiduciary duty are similar in a different respect – that, in situations where the relationship between the parties does not create a fiduciary duty as a matter of law, courts may recognize a fiduciary duty based on the particular circumstances.[6]

---

[5]   See May 15, 2006 letter from Richard A. Rothman, Esq. (citing, inter alia, BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003) and Peskin v. Anderson, [2001] 1 B.C.L.C. 372, 2000 WL 1841707 (C.A.) (no fiduciary duty to shareholders absent special circumstances)).

[6]   See May 15, 2006 letter from Stuart V. Kusin, Esq. (citing, inter alia, Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 459 (S.D.N.Y. 2006) and Oldham v. Kyrris, [2004] 1 B.C.L.C. 305, 2003 WL 22358328 (C.A.)).

It seems exceedingly likely that English law will be applicable to this dispute. The Share Purchase Agreement which effected the sale of Radianz to BT contains an express choice of law provision which provides that English law governs.  (Grigson Decl Ex. K at § 15.16.1)  Though plaintiffs contend that since they are not parties to the Share Purchase Agreement, any choice of law provision contained therein is irrelevant, issues relating to the issuance of options to purchase shares in an English company will also likely be governed by English law.  See, e.g., Krock v. Lipsay, 97 F.3d 640, 645-46 (2d Cir. 1996) (New York applies the law of the jurisdiction having the greatest interest in the dispute); Scottish Air, 81 F.3d at 1234 ("Under the generally-recognized choice-of-law rule, questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation.") (citations omitted).

"Though the Court need not ultimately decide the conflict of laws issue for purposes of this decision, the likely application under New York's choice of law rules of foreign law to this case weighs against retention of the claim."  Corporacion Tim, 418 F. Supp. 2d at 533 (citation omitted); see also Piper Aircraft, 454 U.S. at 251 ("The doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law.").  That English law is likely to apply to plaintiffs' fiduciary duty claim is especially significant because plaintiffs concede that, in order to find that the directors of Radianz owed such a duty to the option holders, the Court would have to expand – or read expansively – the scope of a director's fiduciary duty to an English corporation.

Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established

principles of foreign law.  Cf. Conte v. Flota Mercante del Estado, 277 F.2d 664, 667 (2d Cir. 1960) (Friendly, J.) ("try as we may to apply the foreign law as it comes to us through the lips of the experts, there is an inevitable hazard that, in those areas, perhaps interstitial but far from inconsequential, where we have no clear guides, our labors, moulded by our own habits of mind as they necessarily must be, may produce a result whose conformity with that of the foreign court may be greater in theory than it is in fact") (citation omitted).  And, while the Court of Appeals is empowered to certify to the highest court of a state an "unsettled and significant question of state law that will control the outcome of a case," see 2d Cir. R. 0.27, it, of course, has no such mechanism for seeking clarity from an English court as to the applicable legal principles.  The likely application of foreign law weighs in favor of dismissal.

In sum, defendants have met their heavy burden of demonstrating, in the circumstances attending this case, that the relevant public interest factors overwhelmingly favor dismissal.

Both the private interest and public interest factors weigh strongly in favor of dismissal.  Judge Kaplan's observations in First Union are aptly applied here:

> The proof [for the most part] is in London or closer to London than to New York.  London is a more convenient location for the defendants and for all of the witnesses from the Middle East and Europe.  There is at least a possibility that this Court would be obliged to apply English law to at least part of the dispute.  Most significantly, this Court has no ability to compel the testimony of unwilling witnesses whereas the English High Court enjoys that power with respect to witnesses on British soil.

135 F. Supp. 2d at 454 (footnote omitted).

Conclusion

Having assessed defendants' motion pursuant to the standards established in Iragorri and other cases, I find that dismissal on forum non conveniens grounds is warranted. Defendants' motion is GRANTED. Dismissal is conditioned upon the agreement of all defendants to submit to the jurisdiction of an English court and to waive any defense based on the statute of limitations provided that plaintiffs file suit in England by November 1, 2006.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
July 26, 2006